2023-2386. Mr. Zapadko. Can I quickly ask the parties to what degree are we still truly limited in how we can describe what's in the label? Your Honor, the drug is now, the Rubicon product is now on the market, so we're free. So we can say room temperature? Yes. Okay. We can say refrigerated? Yes. All right then. Everything that's refrigerated is always unprotected. Would have been helpful to know that. I apologize for not looking much more. Good morning, Your Honors. May it please the Court. The District Court's decision here should be overturned for at least two reasons. First, the District Court abused its discretion by allowing Rubicon to advance a late theory at summary judgment, which is not timely disclosed during discovery or in its non-infringement contentions. Second, the District Court improperly granted summary judgment over genuine issues of material fact and through improper application of the case law. Turning to the first issue, Rubicon's untimely presentation of its non-infringement theory warrants reversal. Rubicon first disclosed its non-infringement. Counsel, why don't you get to the merits rather than arguing procedure? Okay. So I will turn to the merits then. So here, the District Court essentially relied on Rubicon's label itself and nothing else to come to its conclusion that there was no induced infringement. The Court concluded that based upon the option to store this at room temperature, that that was insufficient to rise to showing induced infringement, or at least the intent for that. Now, Rubicon has characterized this as being a permissive usage along the way. And to support that and find for no induced infringement, the Court pointed to HZMP, which I think is probably Rubicon's strongest case here, but I think there are distinctions. So in HZMP, we had a situation where the patent claims called for applying a topical, waiting for the area to dry, and then applying a second topical once the area was dry. The generic label in that case had instructed users to apply a material and wait for it to dry until you put on clothing or some other topical. And so this Court characterized that situation as conditional, as an if and when. Let's focus on this case. Okay. The claim says 2 to 8 degrees. That's refrigeration. The label of the accused product is 20 to 25. And yes, it mentions can be stored, but in terms of inducement, that's not an inducement. That's just saying what can occur. Yes, but when you look at the opinion of Dr. Civello, who looked at this label, and he had said, I've never seen a label quite like this. And Dr. Civello was a pharmacist for many years and was a meta-cells expert in this case. He said, I've never seen an instance where I have conflicting storage conditions stated on a label. And often, there are benefits to just refrigerating things. So he said you might defer. It's not really conflicting. The label doesn't say can be stored at 20 to 25 degrees or 2 to 8. That's not what it says. Yes, and I don't disagree with that. But we also are presented with a situation where Rubicon's own expert calls these opposite storage conditions. So to the extent they are conflicting, that comes from their expert. And I would remind the Court that when Rubicon – I would choose to do this. That's not inducement. You have to have evidence that says confronted with this label, I would read this as instructing me to do the infringing act. Yes. I've read his testimony. It doesn't seem to say that. It seems to say that in his experience as a pharmacist, if he sees room temperature refrigeration, he would store it refrigeration. That doesn't go enough to say that the label induced me to store it refrigeration. I think that's a fair point, Your Honor, and to the extent that wasn't – I don't see why this isn't on all floors with HCMP. HCMP had a label that specifically instructed to do one thing and permitted something but did not require the infringing act. This one has something that's not infringing and permits but does not require the infringing act. Well, I think it's an extension of HCMP because this is where I was driving to a moment ago, where HCMP was characterized as this kind of conditional situation where it was if a user was going to eventually do something, this is what they'd do. But here I think we're left with a situation where pharmacists are going to look at this label and refrigerate it. And, again, this goes back to Dr. Savella's opinion. We still have to have something that would support a genuine issue of material fact, one that the label would tell the pharmacist to infringe, not that they have a choice, but that the label read as a whole suggests that they should do the infringing act. It's hard to read into this label when it doesn't say that on its face. Well, that's true. But I think if we zoom out and look at this more generally for just a moment, and we take this in the context of patent inducement generally or more specifically in ANDA cases, if you look at, say, Section 8 carve-out cases, for example, you could be presented with, if this is affirmed on this basis, you have a situation where generic brands could simply say, I'm going to recite an indication that is not infringing, and then below that, every alternative that could be an infringing use. I'm simply stating on that label that those are permissive, so thereby I escape all infringement. And I don't think that that's what HG&P stands for. It might not infringe, but if it's actually to be used for the composition to be used for treatment, then the fact that it's to be used for those conditions is infringing, approximately. This is a little strange because it's a method claim. It's to show that the label says to use the product in an infringing way, not just permit its use under HG&P. And we're frequently faced with method claims of this very nature in these ANDA cases. In fact, most of the ones that we've cited and looked at in this case are framed in this same way. So if we turn to Vanda, for example, I think that's perhaps MetaCell's strongest case in its favor here, where in that instance you had a label that said, well, let me back up. The patent claim called for a certain type of genotyping assay as part of the patent claim. The generic label simply said laboratory tests are available. Now, that's a pretty broad statement. And that certainly says that's permissive in the sense that you could go get genotyping assays conducted. It doesn't instruct a user to do that. And yet this court found that there was induced infringement there. And so I think there's some factual distinctions here, and I don't think HG&P is on all fours for that reason. And when we look at, and turning back to Dr. Civello's opinion for a moment, Dr. Civello said that while I find this confusing, and I recognize there are certain advantages with refrigerating things generally, so sometimes it's for improved taste, it's because patients tend to do what they did when they were using the branded product, or it can prolong the shelf life of a product. In his declaration in support of the motion for reconsideration, Dr. Civello also cited reports from the AHPSA, I believe is the acronym, of a trade association of approximately 60,000 pharmacists who said, we often see issues with generic labeling where they're not looking properly at the safety considerations or other items, and so they're often consulting the reference label drug, which is exactly what Dr. Civello suggested you would do here and store it in that same manner. There is other evidence. How does any of that relate to what the label told him to do, rather than what his own experience as a pharmacist told him to do? Well, because this is the viewpoint of what pharmacists would do across the board. The point is, is he's confronted with a label that says two different things and how it should be stored. And he is saying, I, and on behalf of what I believe other pharmacists would do, I would look at this label and I would refrigerate it on that basis. I think that's a very reasonable outcome here, particularly when you consider how the reference label, the branded drug, is stored. And there was evidence that, or at least Dr. Civello's opinion was that, we often tend to treat generics in the same way we did with a brand. So that's how he gets down to that point of saying, I would look at this label. Well, that seems to go a little too far, because we didn't have this optional phrase, could be stored at refrigeration. Yet the pharmacist knew that the branded drug was always stored at refrigeration. Based on their experience, wouldn't they store the generic at refrigeration anyway? But that nonetheless couldn't even possibly cut the inducement, because that wasn't in the label at all. I mean, you're relying on this reference to the name brand drug and the way they would store it and saying, well, they would just do it the same way as the generic. But that can't be a ground for inducement, because otherwise you could not have anything about refrigeration on the label, but you would still be here arguing inducement. But I think that intent can be inferred on the basis that Rubicon chose to include that storage condition at all. It's not very HCMP. You need something more than that. That's the problem. The evidence you're relying on doesn't go to their intent to induce. It goes to what a pharmacist, who clearly is skilled in the art, what they would do, not what the generic intended them to do. I think the generic entirely understands that this is going to be refrigerated. I think that is the point of Dr. Savella's opinion. I think that is the point of when we reference the statements made to the FDA, what Rubicon understood to be the case. When asked how this is going to be stored, Rubicon told the FDA it would be stored at refrigerated temperatures in the same manner as the reference listed drug. And again, I don't think Rubicon had to include that storage statement at all. If they wanted to get rid of this issue altogether, if they wanted no possibility that it would be refrigerated, then they didn't have to include that on the label. According to their expert who says that this condition is not required. So why else include it unless you expect or intend that it may be refrigerated? I think that's a strong showing of intent. Do you have evidence that Rubicon understood that pharmacists would go ahead and refrigerate it based on the, what I'll call, optional instruction to refrigerate? We do not have direct evidence of it having been stored because we're still sort of left with the hypothetical of what we've got based upon the label and the record in front of us and the opinions of the experts. We have testimony from a 30B6 witness from Rubicon who explained that they included those storage conditions because they needed to match up with what the FDA was telling them to do. But to your point, Your Honor, we do not have direct evidence that it has been stored one manner or another. Counsel, you're into your rebuttal time. You can continue or save it as you wish. I will save my rebuttal time, Your Honor. Mr. Kratz. Thank you, Your Honor. May it please the Court. Sometimes a case is as simple as it appears. I don't think you can reverse this case without reversing HZNP. They don't advocate that you do that. Why did you write into the label the idea of refrigerating at 2 to 8 degrees Celsius? It's as an optional storage condition. I mean, as soon as you write in the infringing act, you're playing with fire. Well, Your Honor, we actually had established that the product was stable at both room temperature and at refrigerated conditions. When you do that, you can then put in the label both options. And the label clearly says... At the same time, you need to avoid 271B liability. Well, I understand that. But the point being that in terms of the label, the label instructs the pharmacist to store at room temperature unless they want to put it in the refrigerator, and they can do that. We've told them that if they do that, we're also stable at that condition. And so it's not a recognition or an expectation that they're going to do that. It's definitely not an inducement that they're going to do that. What if the label, in some of the ways, were to then set, store at either room temperature or refrigeration? I think if it did that, it would actually be closer to HZNP case. I think our case is further away from inducement than in HZNP. I don't understand that. If you're telling the pharmacist to store at one of these or the other one, and one of them is infringing, I think that's inducement, isn't it? I mean, isn't that what GlaxoSmithKline said? No, I don't think so. I think GlaxoSmithKline, if it's the Tuvok case, that's dealing with different indications. And if the evidence in that case suggested that, well, we also might sell for these indications that aren't in the label, but we put it on our website and the like, then sure. Then that's evidence of inducement that the court in this court found was sufficient to at least make a case for infringement. I really don't understand your answer here. Okay, well, I'd like to back up that. If the label instructs the user to store at either a non-infringing or an infringing use, if you're telling them to store at an infringing use, the fact that you're also giving them a non-infringing option, I don't understand how they could check that. I think under HCNP it does, because in HCNP— No, HCNP is different. That's the whole point of this question is HCNP doesn't tell them to do the infringing act at all. It permits it. But if it's a single storage and says, do it either A or B, then the portion of the instruction that directs at B, the infringing use, is inducement. Okay, so first I want to be clear that this is a hypothetical— That's a different label. Right, okay. So let's say this is the hypothetical. Our label itself doesn't do that. Our label itself instructs room temperature and says, but you can also do it refrigerated. But under that hypothetical, I think perhaps it's a fair question. I think our argument would be that we're not telling them to do one or the other. They can do it if they want to do it under that hypothetical. On your label you're telling them to do the non-infringing use. Yeah, exactly. But it says you can also store it at refrigeration. Exactly. What do you do with all your—I mean, what happens— I'm a little troubled by the fact that you went to the FDA and told them, oh, yeah, you'd store it at refrigeration. That's actually not what happened. And the evidence is exaggerated and is not correct. There's non-public portions of the submission that go to the FDA. There's a Q&A section of that non-public portions. So right away we're not dealing with inducement. We're outside of the—it's almost another hypothetical that doesn't exist. But in that Q&A section—and the court found this to be true. They looked at it. The court found that that Q&A dealt with how do you— is there a difference between the way you handle this product if you're going to refrigerate. And it's basically a Q&A that goes over a comprehensive discussion between what are the differences between these products because, as you know, the FDA— What J&E side are we talking about? Do you have the page? The page of the court's opinion? In the JA, in the joint appendix. Yeah. The non-public colloquy you're talking about. Yeah. The FDA. The non-public appendix 1985 is my little site for this, which I think may be— Yeah. That is, in fact, the non-public portion.  So— 1985. I actually wrote that down correctly. Right. So there's a column for Rubicon Storage System.  And it comes right up to the bottom.          It can be stored at 20 degrees— Yeah. —to 25 degrees Celsius. That's— Okay. That's basically the reverse of what the label says, right? Right. So— So what's going on here that seems a little peculiar that— So in— —in your submission to the FDA, you've got, you know, opposite statements. But you also have to understand the label itself was submitted to the FDA. The FDA approved it as the label being, we want to instruct the downstream user to store at room temperature, but optionally at refrigerant conditions. It's possible during this Q&A portion of the hand-to-submission that it was flipped. But by the time we got to the label and what was going to be put into the public stream as to the instructions for storage, then it did change. And it changed to reversal so that, you know, it's good that they did that because then we don't have to— Did the FDA require you to have the refrigeration statement in the label? I think that there was no discussion about whether to take out the optional refrigeration portion of the label. It's not a carve-out situation where you're dealing with an indication. Instead, the label, which all generics try to make it as close to the brand as possible. But here, you know, frankly, this is a situation where we've improved the product. We're stable at room temperature. The fact is, and whether or not the downstream user follows this expert and puts it all in the refrigerator, the fact is it doesn't have to be. Did you file for a patent? Well, you know, there's actually, I mean, there's thought about that, right? Because we created—you have to understand, this entire patent is not— it was barely invented. It took a known drug. It looks like the PTO is handing out patents on these storage limitations. Well, you can get me talking. This particular patent, you know, it issued seven months after the filing date. Your Honor, that is correct. We did make a validity argument, which we didn't pursue or don't need to pursue. But the fact is, it was a known drug. The treatment, it's a method of treating spasticity for patients that have multiple sclerosis, I believe. But that was known. All they did was take it and put an oral solution for it. But they made their oral solution with a citric acid buffer, which is one of the steps required in the patent that we don't meet. And then they had to test for this particular impurity that they created by using the citric acid buffer, which we don't have to test for because we don't use citric acid. And then you have to put it in the refrigerator. So they made a solution, and they got a patent on it. And the patent then has the three steps, to use the citric acid buffer, to test for this impurity that they created, and then to put it in the refrigerator. But those first two, I mean, it seems like you have really good arguments, but they're not before us. Exactly. Because you didn't pursue them. Exactly. And if we get into the, well, we haven't given them up. But what we did... But it seems like you, I don't understand why you went with what seems to be the most complex of the issues. Because the label is tricky, whereas those two things are not. In our estimation, the exact opposite reason is why we did what we did, which is the HCNP case absolutely controls the fact that we gave a direction not to infringe with an option. If they want to put it in the refrigerator, they can. It's not our inducement at all. I did ask, but have you read our other label cases? Because they may support their argument. Yeah, they cited Vanda. Could you discuss that case? Vanda, there was an instruction to do the testing that was on top of it. The genotyping assay that the opposing counsel refers to? The holding, at least in Vanda, was that that testing was being induced by the label. And so it's an impossibility. But did the label actually say genotyping assay? The court held that it was specific enough to be an inducement for it. Where here, it's different. Because here we said, don't do it. You didn't say don't. Don't overstate your case. I understand that. I think you're both overstating your cases both ways. You said do it one way, but you could do it the other way. Do it a non-infringing way. There's no instruction in Vanda in the label. I understand. I understand, and I apologize to the court. I will. But absolutely, we had a non-infringing direction. The only inducement that's taking place with respect to storage conditions in our label, the only inducement is to not infringe. And if there is an infringing use, it's permitted by the label but not required by the label, in your view, under HCMP? If I were to say to you, do your homework, but you can also practice the piano, and then you go off to the piano and start practicing, have I induced you to play the piano? I don't believe so. Under the HCMP analysis, under, and I think in the family. You were sitting there watching TV. But you're understanding. You're watching a sitcom, and then I come into the room, and I say, do your homework, or you can play the piano. The hypothetical is interesting because it's as if there's, like, something exciting about putting this product in the refrigerator. You know, it's exciting to play the piano. And so permitting someone to play the piano as a wink and a nod might be, you know, something that you're thinking about as a parent. But here, it's stored in room temperature, which most drugs are stored at room temperature. And pharmacists know how to do that. And so the idea that they're permitted and instructed to put it in room temperature, that's a good thing. And the fact that you can also put it in the refrigerator, and it's stable if you put it in the refrigerator, which we've had to prove in order to get our ANDA submitted, and there you go. And so the case starts and ends at HCMP, and it starts and ends with our label. Their expert doesn't matter. This non-public portion of the ANDA doesn't matter. The deposition that they claim was our expert, which we don't have an expert, doesn't matter, because none of it relates to the label itself. And the label could not be more clear. It says stored at room temperature, and if you want to, put it in the refrigerator. Now, they do have this secondary argument with respect to our timing. When we made the argument regarding this non-infringement position, your Honor suggested that they move from that. We have answers to that in our briefing. I'm happy to answer any questions as to why we did what we did. Judge Hoots, you asked about why we didn't go for these other arguments. I can explain that as well. The point is we were first to file in this case. We were running against the clock to get this product out of the district court because we had tentative approval midway through this case. And so it was critical for us to get to summary judgment from this court in New Jersey to give us summary judgment. This was what we figured out to be a rifle shot to apply HCMP. We would just like that affirmed at this point as well. Thank you, counsel. Mr. Zapata has some rebuttals. Yes, Your Honor. I'd like to address a few points raised by the panel and Mr. Kratz. So your panel pointed to the Q&A section that Rubicon conducted with the FDA. And what I would direct the panel to is several pages of that ANDA. While they are not sequential in the appendix themselves because of the removal of pages, you will, however, see that they represent the sequence of events of what Rubicon submitted at what time to the FDA. So at APPX 1876, Rubicon submitted an additional statement, which started off with the instruction to store at 20 to 25 degrees. At APPX 1880, you then have the label for Rubicon's product, which starts with storing the label at 20 degrees. However, when we get slightly further in that ANDA and we get to APPX 1985, you have a storage statement that is the one that's at issue here, where it is then flipped. And Rubicon tells the FDA to store this at refrigerated temperatures or to store it at room temperature. And I think there's somewhat of a distinction without a difference here. And one thing that's important, turning to the procedural aspects, is how Rubicon characterized this condition very early in its non-infringement contentions. It referred to this limitation as instructing users to store this under a temperature-controlled condition. Both refrigerated conditions and room temperature conditions are temperature-controlled conditions. So I think when a pharmacist is looking at this label, we look at all of the totality of information here, there is an induced infringement. And to that same end, Mr. Crouch just said that they do not have an expert in this case, but if their expert did submit a rebuttal opinion, which Dr. Civello addressed, which, of course, all arose after the close of reply briefing. I would point to one other thing that I would think helped this panel address some of the issues here. At APPX 6057 to 6058, there was a report in there from the first databank, which was attached to Dr. Civello's declaration. Now, Mr. Crouch explained that most drugs are stored at room temperature. And while this may be true, it's going to be dependent upon the type of drug. You may see pills or things like that often stored on shelves. But the first databank report that Dr. Civello referenced includes instructions, including ones from Cigna, where if you actually look at a QR code on that database, you are directed to a place that says, for baclofen solutions, these should be refrigerated. If you don't have an oral suspension, then you should refrigerate it. Here we're dealing with an oral solution. So this is the reason why when we cast broad strokes about how all drugs are stored, that isn't what's applicable here. And this is why it's important to think about what Dr. Civello said, how one would view this label in the context of these kinds of drugs in the totality of information. And we spent a lot of time with HCMP, but I would want to make one more reference that there is other jurisprudence from this court. And, again, I think VANDA is the one that's most on point here. In VANDA, as I described when I first came up here, that the patent claim said conducted genotyping assay. The generic label said laboratory tests are available. I think that is a far broader, more abstract or ambiguous position than what we have on this label, which says go do your homework or play the piano. I'm going to choose the piano. And with that, I will conclude my time, unless your honors have any further questions. Thank you, counsel. The case is submitted, and that concludes today's argument.